JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
CANDIS MITCHELL, Bar No. 242797
ELISSE LAROUCHE, Bar No. 308533
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:  Candis_Mitchell@fd.org

Counsel for Defendant Csukás

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**CSABA JOHN CSUKÁS,**<br><br>Defendant. | **Case No.:** CR 24–152 WHO<br><br>**DEFENDANT'S SUPPLEMENTAL RESPONSE TO GOVERNMENT SUPPLEMENTAL BRIEF RE 18 U.S.C. § 249(a)(2)(B)(i)(I)**<br><br>**Court:**       Courtroom 2, 17th Floor |

## INTRODUCTION

Defendant Csabas John Csukás respectfully submits this supplemental response to the government's supplemental brief regarding 18 U.S.C. § 249(a)(2)(B)(i)(I). *See* Dkt. 108.

## DISCUSSION

The statute under which Mr. Csukás is charged in this case, 18 U.S.C. § 249(a)(2), broadly sets forth multiple, varied jurisdictional elements that could be alleged and proven to provide federal jurisdiction for a substantive offense under § 249(a)(2). See Defendant's Response to Government Brief re 18 U.S.C. § 249(a)(2)(B)(I), see Dkt. 91 at 2-3 (discussing jurisdictional elements at § 249(a)(2)(B)(i) through (iv).)  As relevant here, however, the indictment returned by the grand jury in this case alleges a crime under § 249(a)(2)(B)(i)(I), which requires the government to prove that Mr. Csukás willfully caused bodily injury to S.B. during the course of S.B.'s travel "across [] a national border." 18 U.S.C. § 249(a)(2)(B)(i)(I); Indictment ¶ 3.

As discussed in Mr. Csukás' original Response brief, the government seeks an impermissibly expansive interpretation of § 249(a)(2)(B)(i)(I) that extends beyond the statute's plain language, arguing that travel "across a [] national border" encompasses more than the air travel that actually brought S.B. across the border from Canada to the United States: his flight from Toronto to San Francisco. See Dkt. 91 1, 4-9. Although S.B. arrived in the United States when he disembarked from his flight at SFO, and his travel "across a [] national border" ended at that time, the government erroneously attempts to stretch § (B)(i)(I)'s travel-across-a-national-border element to a person's separate, downstream travel to locations elsewhere within the country in which they have already arrived. See Dkt. 1. 4-8. Not only is the government's expansive interpretation of travel "across a [] national border" at odds with the plain text of § (B)(i)(I), but the rule of lenity also supports the more-narrow definition of travel "across a [] national border advanced by Mr. Csukás. See id. at 4-9. In particular, in the context of an international flight, an individual's travel "across a national border" begins when the traveler boards their flight in one country and ends when they disembark from their flight in another country. Specific to this case, S.B.'s travel "across a [] national border" under § 249(a)(2)(B)(i)(I) began when he boarded his flight in Toronto and ended when he disembarked from

1 his flight at SFO.

2     As discussed at length in Mr. Csukás' Response, the government's incorrect construction of travel "across a [] national border" is based almost entirely on caselaw that expansively construes the "travels in foreign commerce" provision from an entirely different statute, 18 U.S.C. § 2423(c). *See* Dkt. 91 at 1, 4-8; *see also, e.g.*, *United States v. Schmidt*, 845 F.3d 153, 155-57 (4th Cir. 2019) (explaining the "travels in foreign commerce" element of § 2423(c) "denotes a broader concept of moving abroad" going beyond "[m]ovement directly to or from the United States"); *United States v. Pepe*, 895 F.3d 679, 690 (9th Cir. 2018) (adopting an "expansive[]" reading of § 2423(c)'s "travels in foreign commerce" consistent with, e.g., *Schmidt*). In contrast to § 2423(c), however, "the statutory language Congress employed"[1] in § 249(a)(2)(B)(i)(I) is far narrower and circumscribed, applying only to prohibited conduct that occurs during a particular type of travel: the defendant or victim's travel "across a [] national border." Dkt. 91 at 6-7 (quoting 18 U.S.C. § 249(a)(2)(B)(i)(I)). And the narrow understanding of travel "across a [] national border" advanced by Mr. Csukás is further supported by *United States v. Jackson*, which noted that even the broad concept of "travels in foreign commerce" in § 2423(c) must end at some point, and recognized that the interpreration of that term with "more support in the common [dictionary] definitions of the term 'travel'" (referring to "active movement between places") is that international travel ends "upon arrival" —*i.e.*, when an individual "arrives in a foreign country." 480 F.3d 1014, 1022-23 (9th Cir. 2007). *See* Dkt. 91 at 6-7.

    Despite the plain differences between § 2423(c)'s broad "travels in foreign commerce" element, and the more narrowly tailored, travel "across a [] national border" provision § 249(a)(2)(B)(i)(I), *see* Dkt. 91 at 4-8, the government's supplemental brief effectively ignores these differences, arguing for a "broader definition" by focusing on the word "travel." Dkt. 108 at 2-4. But in so doing, the government repeatedly disregards the statutory language from § 249(a)(2)(B)(i)(I) that **modifies** the word "travel"—*i.e.*, "across a [] national border"—and simply continues its misplaced reliance on caselaw pertaining to § 2423(c)'s indisputably broader jurisdictional provision. *See* Dkt. 108 (citing *United States v. Lindsay*, 931 F.3d 852 (9th Cir. 2019) and *Schmidt*). Thus, while *Lindsay* noted the

---

[1] *United States v. Ballinger*, 395 F.3d 1218, 1230 (11th Cir. 2005) (en banc).

DEF'S SUPPL. RESPONSE BR.
*CSUKÁS*, CR 24–152 WHO

3

Ninth Circuit recently adopted a construction of "travels in foreign commerce" in § 2423(c) under which "traveling is broader than transit and encompasses the entire trip or tour" in foreign commerce, *Lindsay*, 931 F.3d at 860-61 (citing *Pepe*, 895 F.3d 685-86), this expansive interpretation of § 2423(c) still is of no moment here.[2] Section 249(a)(2)(B)(i)(I) remains an entirely different statute, with a narrower jurisdictional provision pertaining to travel "across a [] national border."[3] And under the plain language of *that* statute —the one at issue in *this* case—travel "across a [] national boarder" means travel that begins at a location in one country and ends when the individual arrives in another country. Dkt. 91 at 6-7.

The government's reliance on *Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135, 1138 (9th Cir. 2023), is similarly misplaced. *Carmona* held that certain employees of Domino's Pizza were exempted from the Federal Arbitration Act (FAA) by 9 U.S.C. § 1, which applies to classes of workers "engaged in foreign or interstate commerce." 73 F.4th at 1136. The employees were "last-leg truck drivers" in a supply chain of Domino's Pizza ingredients. *Id.* Domino's bought ingredients from suppliers outside California, who delivered the ingredients to a "supply chain center" in California; there, the ingredients were portioned and packaged, and then the "last-leg drivers" delivered the ingredients to Domino's franchises in California. *Id.* The Ninth Circuit concluded that the truck drivers were workers engaged in interstate commerce under FAA § 1 because they were the final part of a single, unbroken stream of interstate commerce *for Domino's Pizza*: transporting interstate goods "for the last leg to the final destinations." *Id.* at 1136-38 (cleaned up). In so doing, the Court noted its conclusion was unaltered by the fact that the journey of the ingredients "briefly paused" at the supply chain center because "from the outset of the[ir] interstate journey," Domino's had "destined" the ingredients to "inevitably" arrive at the Domino's franchisees. *Id.* at 1138. In other words, the ingredients were being transported in one unbroken stream of travel for Domino's Pizza.

---

[2] *Lindsay* merely referred to the broad interpretation of § 2423(c) that the Ninth Circuit adopted in *Pepe* —and that Mr. Csukás discussed and distinguished in his original Response brief. *See* Dkt. 91 at 6-7 (citing *Pepe*, noting the Ninth Circuit "later aligned itself with" the Fourth Circuit's "expansive[] reading of travel 'in foreign commerce'" in *Schmidt*).

[3] Again, § 249(a)(2)(B) sets forth multiple other jurisdictional elements which provide jurisdiction far more broadly that § (B)(i)(I).

*Carmona* does not help the government here. Unlike the last-leg truck drivers transporting ingredients for Domino's Pizza, a Lyft/Uber/taxi driver who is hired by someone to transport them from the airport to other locations is ***not*** deemed to be continuing their passengers' interstate journeys for purposes of the FAA's interstate-commerce exception. Indeed, this was precisely the issue decided by two of the cases cited by Mr. Csukás in his Response Brief. *See* Dkt. 91 at 8 (citing *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854 (9th Cir. 2021); *Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2021)). Both of those cases *rejected* arguments that Uber/Lyft drivers fell within the interstate-commerce exception of the FAA because they transported passengers who had flown into local airports to their final intra-state destinations. *See Capriole*, 7 F.4th at 863-64; *Cunningham*, 17 F.4th at 250-51. Moreover, both the Ninth Circuit and First Circuit adopted the reasoning of the Supreme Court in *United States v. Yellow Cab*, 332 U.S. 218 (1947), an opinion also cited by Mr. Csukás. *See* Dkt. 91 at 8. As *Yellow Cab* explained, absent a special arrangement wherein a local taxi company is commissioned by an interstate rail company to transport its passengers, a rail passenger's "interstate journey" does ***not*** include local taxicab transportation to/from the train station. *Id.* at 231. Rather, "the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination." *Id.*; *see also Cunningham*, 17 F.4th at 250-51 (applying *Yellow Cab*, concluding Lyft drivers are not part of the "interstate journey" of travelers at Boston Logan Airport; rather, Lyft drivers "take the passenger to the start (or from the finish) of the passenger's interstate journey"). The common understanding of interstate travel in *Yellow Cab* finds ready application to travel "across a [] national border" via an international flight—and is consistent with the interpretation advanced by Mr. Csukás: the travel begins when the passenger boards his flight at the airport in one country, and it ends when he disembarks from his flight at the airport in the other country. Tellingly, the government does not cite or discuss *Yellow Cab*, *Capriole,* or *Cunningham*.

Nor does the government's supplement brief address the rule of lenity. As set forth in Mr. Csukás' original Response Brief, any "ambiguity concerning the ambit of criminal statutes should be resolved in the favor of lenity." *United States v. Jones*, 529 U.S. 848, 858 (2000). Although Mr. Csukás' more-narrow reading of § 249(a)(2)(B)(i)(I)'s during the course of travel "across a [] national

border" element accords with the statute plain text, should the Court find the provision ambiguous, it must apply the rule of here.

Dated:  October 28, 2024

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S
CANDIS MITCHELL
ELISSE LAROUCHE
Assistant Federal Public Defender